IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FILMON X, LLC, a Delaware corporation,<br><br>      Plaintiff,<br><br>  v.<br><br>WINDOW TO THE WORLD COMMUNICATIONS, INC., an Illinois corporation,<br><br>      Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT;**<br><br>**JURY DEMAND** |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff FilmOn X, LLC ("FilmOn"), through counsel, hereby brings its Complaint for Declaratory Judgment against Window to the World Communications, Inc. ("WWCI") and Does 1 through 10, inclusive (collectively, "Defendants"), and alleges as follows:

**INTRODUCTION**

1. Congress and the courts have always protected an individual's right to privately perform copyrighted audiovisual works. That right has been challenged countless times by copyright holders seeking to curtail fair use and exploit additional profits. This case involves the latest of those challenges. On November 12, 2013, WWCI, licensee of PBS station WTTW, accused FilmOn of copyright infringement. But the FilmOn technology at issue enables only private performance. FilmOn does not infringe any copyright.

1

2. WTTW's programming is freely available over the air. Anyone with a digital antenna and digital video recorder ("DVR") within WTTW's broadcast area may privately receive, record and view WTTW programming. FilmOn provides users with the same technology those users may otherwise implement in their own homes; FilmOn's technology, however, is typically not located in a user's home; it is located remotely, within the WTTW broadcast region, and is operated by the user over the Internet. Moving a user's antenna and DVR from the user's home to another location does not render that user's private performance public.

3. FilmOn users may tune their uniquely assigned antenna to receive the WTTW broadcast signal, which signal is then recorded by the user on a hard drive database (the functional equivalent of a DVR), which is also uniquely assigned to a particular user. The only difference between someone with a digital antenna in their home and a user of FilmOn's technology is the location of the antenna and DVR – users of FilmOn may only view and record the same programming they would be able to view and record with a digital antenna and DVR in their living room.

4. FilmOn's technology serves an important government interest in "preserving the benefits of free, over-the-air local broadcast television" recognized by the Supreme Court in *Turner Broadcasting System, Inc. v. FCC,* 520 U.S. 180, 189 (1997). FilmOn technology enhances the individual's ability to watch the same free over-the-air broadcast content that the American public is entitled to receive in accordance with the public interest recognized by Congress and the Supreme Court. As a non-profit and a PBS partner, WTTW should value that public interest highly, particularly when individual viewers have an interest in using new technologies to access free-to-air television programming.

5. Despite the important benefits served by FilmOn's technology, WWCI has threatened suit on the basis that FilmOn is "publicly performing" WTTW's copyrighted television content in violation of the 1976 Copyright Act. However, FilmOn does not publicly perform copyrighted work any more than the manufacturers of digital antennas, televisions or set-top television boxes publicly perform such works. Indeed, FilmOn's technology was specifically designed to comply with the law by rendering only private performance. FilmOn's service implements legal technology and methods to enable individual users greater access to free-to-air content.

6. Declaratory judgment is necessary to clear the air of this controversy and protect the right of private performance.

## JURISDICTION AND VENUE

7. This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, seeking a declaration of rights regarding the parties to this litigation with respect to an actual and justiciable controversy arising under the copyright laws of the United States, 17 U.S.C. § 101, *et seq.*

8. The Court has exclusive jurisdiction over the copyright subject matter of this action pursuant to the Copyright Act (17 U.S.C. § 101 *et seq.*), 28 U.S.C. §§ 1331, 1338, and the Declaratory Judgment Act (28 U.S.C. § 2201).

9. This Court has personal jurisdiction over WCCW because WCCW is an Illinois corporation with its principal place of business in this district. Moreover, WCCW does continuous and systematic business in Illinois and this district.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

**THE PARTIES**

11. FilmOn X, LLC is a Delaware limited liability corporation with its principal place of business at 301 N. Canon Drive, Beverly Hills, California 90210. FilmOn is an Internet-based content provider that has developed technology enabling its users to legally view certain free-to-air broadcast television content, using uniquely assigned, remotely located antennas and DVRs.

12. On information and belief, Window to the World Communications, Inc. is an Illinois corporation with its principal place of business at 5400 N. Saint Louis Avenue, Chicago, Illinois 60625. WWCI owns and operates the television station WTTW, an FCC-licensed broadcast station and member of PBS that broadcasts to viewers over the air on channel 11 in the Chicago area.

13. The true names and capacities, whether individual, corporate, associate, or otherwise, of certain Defendants sued in this complaint as DOES 1-10 (collectively, the "Doe Defendants"), are presently unknown to FilmOn, who therefore sues them by fictitious names. FilmOn will amend the complaint to allege their true names and capacities when ascertained. FilmOn is informed and believes and therefore alleges that all Defendants, which include the Doe Defendants, were or are, in some way or manner, possess cognizable interests in this declaratory relief action or are otherwise responsible in some manner for the occurrences alleged in this complaint.

14. FilmOn is informed and believes and thereon alleges that at all times mentioned each Defendant was the agent, servant, employee, co-venturer, representative, or co-conspirator of each of the other Defendants, and acted with the knowledge, consent, ratification, authorization and/or at the direction of each Defendant, or is otherwise responsible in some manner for the occurrences alleged in this complaint.

## GENERAL BACKGROUND

A.  **WTTW's Duty To Provide Free Over-The-Air Broadcasting**

15. The American public has the right to access free over-the-air broadcasting. The United States Constitution recognizes this right through the First Amendment's protection of participation in the marketplace of ideas. 4-19E *Nimmer on Copyright* § 19E.02 (2012) (First Amendment recognizes the public's right to be informed of matters of general interest). Since the enactment of the Radio Act of 1927, it has been a central tenet of American communications policy that a license to use the valuable resource of the public airwaves carries with it the obligation to operate in the public interest, convenience, and necessity. Pub. L. No. 69-169, 44 Stat. 1162 (1927); *see also* 47 U.S.C. § 303 (directing the Federal Radio Commission to grant licenses to the public airwaves in the "public convenience, interest, or necessity.").

16. Broadcast television networks (such as PBS, and by extension WTTW) use, for free, a resource worth billions of dollars (or more)[1] – the public radio spectrum. Pursuant to the Communications Act of 1934, the networks are granted licenses to operate only if the "public convenience, interest, or necessity will be served thereby." 47 U.S.C. § 307(a). They are

---

[1] Economist Thomas Hazlett has explained that "Today, the social opportunity cost of using the TV Band for television broadcasting – 294 MHz of spectrum with excellent propagation characteristics for mobile voice and data networks, including 4G technologies – is conservatively estimated to exceed $1 trillion (in present value)." Comment of Thomas Hazlett, in "A National Broadband Plan for Our Future," GN Dckt. No. 09-51, Federal Communications Commission (filed Dec. 18. 2009), *available at* http://mason.gmu.edu/thazlett/pubs/NBP_PublicNotice26_DTVBand.pdf. More conservatively, CTIA – The Wireless Association and the Consumer Electronics Association have concluded that the FCC's broadcast incentive auctions, where only a few broadcasters would give up their licenses to more productive uses, could produce more than $33 billion in revenue for the U.S. Treasury. *See* "CTIA and CEA Study Finds Broadcast Incentive Auction Will Net U.S. Treasury More Than $33 Billion," Feb. 15, 2011, http://www.ctia.org/media/press/body.cfm/prid/2051.

required to serve the needs and interests of the communities to which they are licensed. If a broadcaster fails to meet its public obligations, the Federal Communications Commission can decline to renew its license. 47 U.S.C. § 309(k).

17. As over-the-air broadcasters, networks also receive special statutory rights, including: The right to demand carriage by cable systems, 47 U.S.C. § 534; guaranteed placement on the "basic tier," 47 U.S.C. § 543(b)(8); and the legal right to "consent" to the retransmission by cable systems of programming they may not own the copyright to, 47 U.S.C. § 325(b). In exchange for these rights – and in recognition of the fact that the number of broadcast licenses is limited – the networks have an obligation to serve the public. *Red Lion Broad. Co. v. FCC*, 395 U.S. 367 (1969) (citing S. Rep. No. 86-562, at 8-9 (1959)) ("[B]roadcast frequencies are limited and, therefore, they have been necessarily considered a public trust.").

18. Since the earliest days of broadcasting, policymakers have required stations to make their service freely available to the public. *Id.* at 390; *see also Third Annual Report of the Federal Radio Commission* 34 (1929), available at http://transition.fcc.gov/fcc-bin/assemble?docno=291101. The Supreme Court has also held that "preserving the benefits of free, over-the-air local broadcast television" is an important government interest. *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 189 (1997).

19. More recently, with the emergence and rapid growth of online services, individual viewers increasingly look to the Internet as a medium to access and watch free-over-the-air content. The Department of Justice has recognized that online video distribution services give television viewers more choices of how to receive programming, as well as greater access to the programming itself. *See Competitive Impact Statement of the Department of Justice at 10-11, United States v. Comcast Corp.*, 1:11-cv-00106, (D.C. Cir. Jan. 18, 2011) (available at

http://www.justice.gov/atr/cases/f266100/266158.pdf). The DOJ has found that online companies (like FilmOn) announce "[n]ew developments, products, and models . . . on almost a daily basis . . . seeking to satisfy consumer demand," and competitive pressures from online video distributors stimulate incumbents such as cable networks to offer more on-demand choices, further enhancing consumer choice. *Id*. at 15-16. Similarly, the FCC has stated that online video distributors "can provide and promote more programming choice, viewing flexibility, technological innovation and lower prices." *See In the Matter of Applications of Comcast Corporation, General Electric Company and NBC Universal, Inc. for Consent to Assign Licenses and Transfer Control of Licensees, Memorandum Opinion & Order*, 26 FCC Rcd. 4238 ¶ 78 (2011) (available at http://hraunfoss.fcc.gov/ edocs_public/attachmatch/FCC-11-4A1.pdf).

**B.      An Individual's Right Of Private Performance Under The Copyright Act**

20.     The Copyright Act "has never accorded the copyright owner complete control over all possible uses of his work." *Sony Corp. v. Universal Studios, Inc.*, 464 U.S. 417, 432 (1984) (footnote omitted). Congress always has maintained the individual's right to privately perform copyrighted works. The Copyright Acts of 1856, 1897 and 1909 explicitly preserved these private rights by confining the copyright holder's exclusive performance right to public performances. *See* Copyright Act of 1856, 11 Stat. 138 (1856); Copyright Act of 1897, 29 Stat. 481 (1897); Copyright Act of 1909, §1(c)-(e), 35 Stat. 1075 (1909). Congress deliberately incorporated that policy imperative into the 1976 Copyright Act.

21.     Under the Copyright Act of 1976, content owners have the exclusive right to "perform the copyrighted works publicly," but *private performances* following the initial public performance are exempt from copyright liability. 17 U.S.C. § 106(4). In relevant part, the

Transmit Clause of the Copyright Act states:

> To perform or display a work 'publicly' means . . . to transmit or otherwise communicate a performance or display of the work . . . *to the public*, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or different times.

U.S.C. § 101 (emphasis added). The phrase "to the public" reflects Congress' intent that an individual's private performances do not violate copyright holders' rights. Only a public performance by that user generates copyright infringement liability.

22. Broadcast television networks have consistently fought to curtail the right to private performance each time innovation rendered it more accessible to private individuals. Indeed, the networks have a decades long history of opposing nearly every technological innovation rendering content more accessible to consumers. Almost all of those technologies opposed are now widely accepted and unobjectionable, even to copyright holders. For instance, when Sony first developed the Betamax VCR, enabling consumers to record and time shift television programming, owners of television and film copyright owners sued arguing infringement. *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). They lost (*id.*), and the VCR became an accepted and widely used product. Later, as DVR technology came to supplant VCRs, the networks again acted to prevent consumers from using DVR technology. *See Paramount Pictures Corp. v. ReplayTV*, 298 F. Supp. 2d 921 (C.D. Cal. 2004). The Networks also opposed Remote Service DVR technology – and lost. *See Cablevision,* 536 F.3d 121. The Networks currently seek to block innovation improving DVR technology. *See, e.g., Fox Broadcasting Company, Inc. v. Dish Network, L.C.C.*, 905 F. Supp. 2d 1088 (C.D. Cal. 2012) (appeal pending).

23. In their latest attempt to curtail an individual's fair use rights, the networks – in

8

this case, WWCI – have targeted FilmOn in another ill-conceived attempt to squash innovation and the right of private performance. Major television networks have filed copyright actions against FilmOn and Aereo in four federal circuits across the country. Based on materially identical facts, the Second Circuit and the District of Massachusetts have protected the right of private performance, finding that the technology used by FilmOn merely enables the right of private performance and does not infringe the content owners' public performance rights. *WNET, Thirteen v. Aereo, Inc.*, Nos. 12-Civ-2786, 12-Civ-2807, 2013 WL 1285591, at *1 (2d Cir. Apr. 1, 2013) ("*Aereo*"); *Hearst Stations Inc. v. Aereo, Inc.*, 2013 WL 5604284, at *9 (Mass. Dist. Ct. Oct. 8, 2013) (appeal pending). The Central District of California and the District Court for the District of Columbia reached the opposite result, ruling in favor of the networks. *Fox Television Stations, Inc. v. BarryDriller Content Systems, PLC*, 915 F. Supp. 2d 1138 (C.D. Cal. 2012) (appeal pending); *Fox Television Stations, Inc. v. FilmOn X LLC*, 2013 WL 4763414 (D.C. Cir. Sept. 5, 2013) (appeal pending). Appeals are pending in the First and Ninth Circuits, as well as the D.C. Circuit.

## FILMON'S TECHNOLOGY ENABLES ONLY PRIVATE PERFORMANCE, WHICH DOES NOT INFRINGE COPYRIGHT

24. FilmOn's technology enables consumers to create and access, from any Internet-enabled device, unique copies of the same free-to-air broadcast programming that they are able to access freely with traditional "rabbit ears." Individuals can record and play-back unique copies of the free-to-air broadcast programming at a later time, just as they could with a traditional DVR. The commercial programming being broadcast over the local signal is not interrupted in any way while the broadcast is streaming. Thus, the technology merely enhances how individuals may watch over-the-air broadcast content, which WTTW and other broadcast

stations must provide for free in accordance with the public interest recognized by the FCC, Congress and the Supreme Court.

25. On November 12, 2013, an affiliate of FilmOn received a letter from WWCI, licensee of WTTW, regarding "Notice of Copyright Infringement and Violation of Other Rights." In that letter, WWCI incorrectly argues that "FilmOn's streaming of WTTW's broadcast service and copyrighted programming constitutes willful copyright infringement." WWCI alleges that FilmOn's service streams content belonging to WWCI in violation of Section 106(4) of the Copyright Act of 1976. WCCI is mistaken.

26. FilmOn's technology does not stream unlicensed content to the public in violation of the Copyright Act. That technology was specifically designed to comply with the requirements of the Copyright Act. A FilmOn user must exercise his or her volition to tune into, record and then view, a copyrighted program transmitted over the public airwaves. Only after a user has utilized FilmOn's technology to perform the steps of tuning and recording may that user transmit and view a private, unique copy of the copyrighted program. Each transmission made by the consumer is private, from a single and unique copy particular only to that consumer.

27. Functionally, the FilmOn system operates similarly to a television with a digital antenna and a DVR, which may be located in an individual's living room or anywhere else the individual may choose. In the case of FilmOn, the digital antenna and DVR are remotely located. The television screen may be a computer or handheld device. Just as the manufacturers of televisions, digital antennas and set-top boxes available at Best Buy are not liable for copyright infringement based on users' activities, FilmOn is not liable. Sony, for example, sells hundreds of thousands of televisions and DVRs, but it is not liable for any public performance, even if every Sony user were to record and watch the same copyrighted broadcast. Each Sony

user has the independent right to privately perform copyright material – those users cannot be aggregated to convert their separate private performances into a public performance. Nor may FilmOn users' private performances be aggregated to create a public performance.[2] FilmOn is not liable for any infringement based on the actions of various individuals, each of which employs uniquely assigned FilmOn technology.

28. FilmOn's technology operates as follows: (1) its technology is initiated by the user and based on the use of a uniquely assigned miniature antenna; (2) each user tunes his or her own unique antenna into a program of his or her choosing (a program that is otherwise freely available over the airwaves); (3) the user records a copy of the program in a unique directory containing the only data selected for recording by the particular user; and (4) once a program is recorded, each user has the ability to control his or her private copy of the data, and that user may perform such functions as play, pause, etc., much like the user could otherwise do operating a DVR located in his or her home.

29. FilmOn's technology directly parallels the technology at issue in another case, recently decided by the Second Circuit, *Aereo*. The Second Circuit explained that technology as follows:

> When an Aereo customer elects to watch or record a program . . . Aereo's system creates a unique copy of that program on a portion of a hard drive assigned only to that Aereo user. And when an Aereo user chooses to watch the recorded program . . . the transmission sent by Aereo and received by that user is generated from that unique copy. No other Aereo user can ever receive a transmission from that copy. Thus, just as in *Cablevision*, the potential audience of each Aereo transmission is the single user who

---

[2] The aggregation of private performances is particularly troubling in the broader context of cloud computing. In that context, users routinely store private copies of copyright material in "the cloud," a remote, generally unspecified, location. Cloud computing users may then transmit those unique copies of that material to render a private performance. If those transmissions were somehow aggregated to convert private performances into public performance, the cloud computing industry would be virtually undone.

requested that a program be recorded.

*Aereo*, 712 F.3d at 682-83.  As with Aereo, transmissions made by users of FilmOn's technology do not constitute a public performance of any copyrighted work.  Rather, that technology is used by consumers to make private performances consistent with what is allowed under the Transmit Clause.

30. In essence, FilmOn's service allows users to access free-to-air programming via the use of an antenna that is functionally a modern high tech version of the traditional TV antennas that have been in legal use in the United States for decades.  The only functional differences between FilmOn's service and a traditional home "rabbit ears" antenna are:  (1) The user's private antenna and digital recording device are remotely located; (2) FilmOn's Internet software allows users to tune a specifically assigned antenna, replacing the traditional remote control; and (3) FilmOn facilitates the viewing of content selected and recorded by the user on any Internet enabled device.

31. FilmOn seeks a declaratory judgment of non-infringement in this action to redress its injuries and determine the parties' respective rights and duties.  WCCI's baseless threats of copyright infringement have raised a cloud of uncertainty around FilmOn's legal service.  Accordingly, declaratory judgment is appropriate.

<b><u>COUNT I – DECLARATORY JUDGMENT OF NONINFRINGEMENT OF COPYRIGHT</u></b>

32. FilmOn reincorporates and re-alleges the allegations contained in all preceding paragraphs as if fully stated herein.

33. An actual controversy has arisen and now exists between FilmOn and Defendants concerning their respective rights and duties in that WCCW contends that FilmOn is "publicly

performing" its copyrighted television content in violation of the Copyright Act of 1976, whereas FilmOn disputes that contention and contends that its service merely allows consumers to receive free over-the-air broadcast signals via the Internet, which those consumers are entitled to receive and which broadcasters are required to transmit under statutory obligations.

34. FilmOn desires a judicial determination of its right and duties, and judicial declarations as to which party's interpretation of the Copyright Act is correct.

35. A judicial declaration is necessary and appropriate at this time under the circumstances in order that FilmOn and Defendants may ascertain their rights and duties under the Copyright Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff FilmOn X, LLC prays for a judgment as follows:

A) That the Court enter a judgment in FilmOn's favor declaring that FilmOn's service does not constitute copyright infringement.

B) That the Court enter a judgment in FilmOn's favor and against Defendants declaring that FilmOn has not violated the Copyright Act with respect to any of Defendants' copyrighted works.

C) For such other and further relief as the Court may deem proper.

## JURY DEMAND

FilmOn respectfully requests a trial by jury.

Dated: November 22, 2013    By: /s/ Vivek Jayaram
                                Vivek Jayaram


                                Vivek Jayaram
                                Jayaram Law Group, LTD.

        33 N. LaSalle Street
        Suite 2900
        Chicago, IL 60602

        Counsel for Plaintiff FilmOn X, LLC


Dated: November 22, 2013        By: /s/ Ryan G. Baker

        Ryan G. Baker (To Be Admitted *Pro Hac Vice*)


        Ryan Geoffrey Baker
        Baker Marquart LLP
        10990 Wilshire Blvd., Fourth Floor
        Los Angeles, California 90024
        Telephone: (424) 652-7800 / Fax: (424) 652-7850
        E-Mail: rbaker@bakermarquart.com

        Counsel for Plaintiff FilmOn X, LLC