## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| FILMON X, LLC, a Delaware corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WINDOW TO THE WORLD | ) | |
| COMMUNICATIONS, INC., an Illinois | ) | |
| corporation; DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | 13 C 8451 |
| | ) | |
| WINDOW TO THE WORLD | ) | |
| COMMUNICATIONS, INC. d/b/a WTTW, | ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FILMON X, LLC, FILMONTV, INC., | ) | |
| FILMON.TV NETWORKS, INC., | ) | |
| FILMON.COM, INC., and | ) | |
| ALKIVIADES DAVID, | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

Plaintiff FilmOnX, LLC ("FilmOnX") originally filed this declaratory judgment action against Defendant Window to the World Communications, Inc. ("WTTW") in November 2013. FilmOnX sought a declaratory judgment that certain technology it used to enable consumers to access WTTW's broadcast programming

"from any Internet-enabled device" does not infringe any WTTW copyright. *See* Compl., Dkt. 1, ¶¶ 1, 24. WTTW counterclaimed for copyright infringement in January 2014, *see* Dkt. 15, at 19; and FilmOnX answered that counterclaim in February 2014. *See* Dkt. 23. Shortly afterward, in March 2014, FilmOnX filed, and the Court granted, an Unopposed Motion to Stay the case pending the Supreme Court's decision in *American Broadcasting Companies, Inc. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014) [hereinafter *Aereo III*], which was anticipated to address a copyright issue concerning a service similar to that used by FilmOnX. *See* Dkts. 28-31.

Shortly after the Supreme Court's decision in *Aereo III*, FilmOnX sought and obtained leave "to amend its complaint and plead that it is entitled to a statutory license as a 'cable system' pursuant to 17 U.S.C. § 111 ('Section 111')," relying upon certain language in the Supreme Court's *Aereo III* opinion. *See* Dkt. 35, at 1; Dkt. 36. FilmOnX thereafter filed its First Amended Complaint for Declaratory Judgment (Dkt. 37); WTTW filed its Answer and Amended Counterclaim for copyright infringement (Dkt. 38);[1] and FilmOn filed its Answer to that Counterclaim (Dkt. 39). In that Answer, FilmOn added a new fifteenth affirmative defense asserting that its "retransmission of WTTW's copyrighted works is authorized under the compulsory license scheme set forth under Section 111 of the Copyright Act." *Id*. at 14.

---

[1] WTTW's Amended Counterclaim named as Defendants FilmOnX, along with FilmOn.TV Networks, Inc.; FilmOn.TV, Inc.; FilmOn.com, Inc.; and their founder, CEO, and/or majority shareholder, Alkiviades David. *See* Dkt. 38, at 29-30; Dkt. 39, at 7-8; Dkt. 39-1, at 6-7. These Counterclaim Defendants are collectively referred to herein as "FilmOn."

Now before the Court are the parties' cross-motions for partial summary judgment. *See* Dkts. 48 (WTTW Motion) and 57 (FilmOn Motion). Each side seeks summary judgment in its favor on (1) FilmOn's declaratory judgment claim "seeking a judicial declaration that FilmOnX meets the statutory definition of a 'cable system' under Section 111 of the Copyright Act and is entitled to a compulsory license thereunder," Dkt. 37, ¶ 5; and, correspondingly, (2) FilmOn's fifteenth affirmative defense to WTTW's copyright infringement counterclaim, asserting that "retransmission of WTTW's copyrights works is authorized under the compulsory license scheme set forth under Section 111 of the Copyright Act." Dkt. 39, at 14; Dkt. 39-1, at 14. For the following reasons, WTTW's motion for partial summary judgment on these issues (Dkt. 48) is granted, and FilmOn's motion for partial summary judgment on these issues (Dkt. 57) is denied.

## BACKGROUND

As FilmOn's motion for a stay acknowledged, this case is one of several across the country involving similar technology, and which, at the time of FilmOn's stay motion, were likewise awaiting the Supreme Court's decision in *Aereo III*. *See* Dkt. 28, at 2. Because an understanding of these other litigations and the Copyright Act provisions at issue in them informs the issues presented in this case, the Court begins with a brief summary of those proceedings and the history underlying the two Copyright Act provisions they address: the "Transmit Clause" and the "compulsory license" provision in 17 U.S.C. §§ 101 and 111.

Congress added these two provisions to the Copyright Act as part of its 1976 amendments to that Act. That legislation superseded two Supreme Court decisions holding that "community antenna television (CATV) systems (the precursors of modern cable systems) fell outside the Act's scope," because their function was to "transmit" the copyrighted content rather than "perform" it. *See Aereo III*, 134 S. Ct. at 2504-05 (discussing *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968), and *Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 394 (1974)). The amended Act thus clarified that "to 'perform' an audiovisual work means 'to show its images in any sequence or to make the sounds accompanying it audible." *Id*. at 2505-06 (quoting 17 U.S.C. § 101).

Correspondingly, "Congress also enacted the Transmit Clause, which specifies that an entity performs publicly when it 'transmits a performance to the public." *Id*. (quoting 17 U.S.C. § 101, brackets and ellipses omitted). "Cable system activities, like those of the CATV systems in *Fortnightly* and *Teleprompter*, lie at the heart of the activities that Congress intended this language to cover." *Id*. Also highly relevant to this case, the 1976 amendments created a new section—Section 111—to regulate cable companies' public performances of copyrighted works. "Section 111 creates a complex, highly detailed compulsory licensing scheme that sets out the conditions, including the payment of compulsory fees, under which cable systems may retransmit broadcasts." *Id*. "Congress made these three changes to achieve a similar end: to bring the activities of cable systems within the scope of the Copyright Act." *Id*.

4

FilmOn and its predecessors and competitors have been parties in several lawsuits addressing the applicability of these Copyright Act provisions to various services that, like the FilmOn service at issue in this case, retransmit television broadcasts over the Internet. For instance, in 2010, certain broadcasters and television networks filed two lawsuits for copyright infringement in the Southern District of New York—one against FilmOn.com, Inc. and one against its competitor, ivi, Inc.[2] As in this case, the defendants in these earlier cases asserted that the accused internet retransmission service was a "cable system" entitled to a compulsory license under § 111 of the Copyright Act. *Id*. The New York court disagreed and issued a temporary restraining order against FilmOn.com, after which it stipulated to a permanent injunction. *See id*. The case against ivi similarly resulted in a district court decision holding that an Internet-based retransmission service was not a "cable system" and therefore not entitled to a compulsory license under Section 111. *See WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 617 (S.D.N.Y. 2011). The Second Circuit affirmed that holding in a decision now known as "*ivi II*." *See WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1585 (2013).

The next set of cases (which included this action) involved a new Internet service used by FilmOnX and another of its competitors, Aereo. In 2012, these companies launched a service for streaming broadcast television programming over

---

[2] *See Fox Television Stations, Inc. v. AereoKiller*, 115 F. Supp.3d 1152, 1155 (C.D. Cal. 2015) [hereinafter *AereoKiller*] (citing *CBS Broad., Inc. v. FilmOn.com, Inc.*, No. 1:10-cv-07532 (S.D.N.Y., filed Oct. 1, 2010); *WPIX, Inc. ivi, Inc.*, 1:10-cv-07415-NRB (S.D.N.Y., filed Sept. 28, 2010)).

the Internet utilizing a separate "mini-antenna" and "separate data stream" for each user. *See Fox Television Stations, Inc. v. FilmOn X LLC*, -- F. Supp. 3d --, 2015 WL 7761052, at *2 (D.D.C. Dec. 2, 2015) [hereinafter *Fox Television*]; *AereoKiller*, 115 F. Supp. 3d at 1155. Notably, FilmOnX (unlike FilmOn.com before it) "explicitly disclaimed" that this mini-antenna service "was a cable system entitled to a compulsory license," relying instead on Second Circuit precedent holding that transmission of a single copy to a single subscriber is not "public" and thus avoids liability under the Copyright Act's Transmit Clause. *See Fox Television*, 2015 WL 7760152, at *2; *AereoKiller*, 115 F. Supp. 3d at 1154-55, 1162. Adhering to that case law, the Southern District of New York and the Second Circuit held in *Aereo I* and *Aereo II* that Aero's (and thus FilmOnX's) mini-antenna technology did not infringe the Transmit Clause. *See WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676 (2d Cir. 2013), *aff'g*, 874 F. Supp. 2d 373 (S.D.N.Y. 2012). But the Supreme Court reversed that decision in *Aereo III*, holding that a system of separate antennas generating separate data streams does not avoid Transmit Clause liability, "regardless of the number of discrete communications it makes." *See Aereo III*, 134 S. Ct. at 2509.

In reaching the conclusion that Aereo's mini-antenna system falls within the scope of the Copyright Act's Transmit Clause, the Supreme Court considered the similarities and differences between that system and the cable systems "that Congress amended the Act to reach." *Id*. at 2506. Among other distinctions, the Court considered that the cable systems embraced by the 1976 Copyright Act amendments

"transmitted constantly," whereas "Aereo's system remains inert until a subscriber indicates that she wants to watch a program." *Id*. at 2507. But, the Court noted, "this difference means nothing to the subscriber" and "nothing to the broadcaster." *Id*. Thus, given "the many similarities between Aereo and cable companies, considered in light of Congress' basic purposes in amending the Copyright Act," the Court concluded that this distinction "does not make a critical difference" to the question of whether Aereo's system "transmits" within the meaning of that Act. *Id*.

The Court also considered that "an Aereo subscriber receives broadcast television signals with an antenna dedicated to him alone," since Aero "streams the content of the copy to the same subscriber and to no one else," and thus, "only one subscriber has the ability to see and hear each Aereo transmission." *Id*. at 2508. But the Court rejected Aereo's argument that such individualized transmission is not "a performance 'to the public.'" *Id*. Rather, the Court concluded: "In terms of the Act's purposes, these differences do not distinguish Aereo's system from cable systems, which do perform 'publicly.' . . . They concern the behind-the-scenes way in which Aereo delivers television programming to its viewers' screens," and "do not render Aereo's commercial objective any different from that of cable companies," or "significantly alter the viewing experience of Aereo's subscribers." *Id*. Thus, the Court concluded, when Aereo's mini-antenna system "streams the same television program to multiple subscribers," it "transmits a performance . . . to the public, within the meaning of the Transmit Clause." *Id*. at 2509-10.

Given the similar services offered by Aereo and FilmOn, the Supreme Court's decision in *Aereo III* posed implications not only for the case against Aereo on remand in the Southern District of New York, but also for several cases brought against FilmOn and related entities in other district courts. These cases included one against FilmOnX in the District of Columbia (*Fox Television*, 2015 WL 7761052); one against FilmOnX's predecessor "AereoKiller" in the Central District of California (*AereoKiller*, 115 F. Supp. 3d 1152); and this case.

"In the wake of *Aereo III*," the defendants in these four cases (including this case) "switched their theories and amended their answers to articulate a new position—namely, that they are entitled to a § 111 compulsory license to retransmit Plaintiffs' television programming."[3] Also, in addition to these four cases, a contempt proceeding was brought against FilmOn.com in the Southern District of New York in connection with its stipulated injunction in *CBS Broadcasting* (*see supra* note 2). There too, FilmOn argued (as it had, and lost, years earlier) for a compulsory license under § 111 of the Copyright Act. *See CBS Broad., Inc. v. FilmOn.com, Inc.*, No. 10 Civ. 7532, 2014 WL 3702568, at *3 (S.D.N.Y. July 24, 2014). But this time it pointed to the Supreme Court's opinion in *Aereo III* for support. *See id*.

---

[3] *See Fox Television*, 2015 WL 7761052, at *3; *AereoKiller*, 115 F. Supp. 3d at 1155 ("After the Supreme Court's *Aereo III* decision, Defendants switched theories" and "argued to the Southern District of New York, as they argue here, that statements in *Aereo III* implied that Defendants' system qualified as a 'cable system,' and thus, for a compulsory license."); Dkt. 35, at 1 ("FilmOnX seeks to amend its complaint and plead that it is entitled to a statutory license as a 'cable system' pursuant to 17 U.S.C. § 111 . . . following the Aereo opinion").

8

One of these courts (the Central District of California) sided with FilmOn on this question, *see AereoKiller*, 115 F. Supp. 3d at 1158-71, whereas the other two (the District of Columbia and the Southern District of New York) rejected FilmOn's argument that *Aereo III* paved the way for a compulsory license under the Copyright Act. The latter two courts held instead that "the Internet-based retransmission system relied upon by FilmOnX is not entitled to a § 111(c) compulsory license." *See Fox Television*, 2015 WL 7761052, at *13; *CBS Broad.*, 2014 WL 3702568, at *4. The Southern District of New York held likewise in "*Aereo IV*" on remand from the Supreme Court's reversal in *Aereo III*. *See Am. Broad. Cos. v. Aereo, Inc.*, No. 12-1540, 2014 WL 5393867, at *4-5 (S.D.N.Y. Oct. 23, 2014). This Court now addresses the same question and holds, like the Southern District of New York and the District of Columbia, that FilmOn's Internet-based retransmission service does not meet the definition of a "cable system" under 17 U.S.C. § 111(f)(3) of the Copyright Act, and is therefore not entitled to a § 111 compulsory license. Here is why.

## ANALYSIS

As discussed above, at the same time Congress amended the Copyright Act to reach the activities of cable television systems, it also established a "compulsory licensing scheme" for such entities, provided certain conditions (such as royalty payments and various reporting requirements) are met. *See Aereo III*, 134 S. Ct. at 2506; 17 U.S.C. § 111. The 1976 amendments to the Copyright Act thus provided for a "statutory license" to a "cable system," which the Act defines as follows:

> A *"cable system"* is a facility, located in any State, territory, trust territory, or possession of the United States, that in whole or in part *receives signals transmitted or programs broadcast* by one or more television broadcast stations licensed by the Federal Communications Commission, *and makes secondary transmission of such signals or programs by wires, cables, microwave, or other communications channels to subscribing members of the public* who pay for such service.

17 U.S.C. § 111(f)(3) (emphasis added).

WTTW argues that FilmOn's Internet-based retransmission system fails to meet this definition because it is not a "facility" that both "receives signals" *and* "makes secondary transmissions of such signals" to the public by a "communications channel," because "the Internet is not a 'communications channel,'" but rather, "an international network of millions of interconnected computers." Dkt. 56, at 7-8. To support this construction, WTTW points to "the overall statutory scheme" and "the context animating Congress' enactment of Section 111," as well as the Copyright Office's longstanding position that an Internet retransmission service "falls outside the scope of the Section 111 license." *Id*. at 6, 14. FilmOn counters that "content delivered over the Internet is transmitted over wires, cables, microwaves and other communications channels" as described in § 111, and argues that its Internet retransmission system thus "fits squarely within the definition of a cable system." Dkt. 80, at 7-8. To support its construction, FilmOn points to language in the Supreme Court's opinion in *Aereo III* comparing an Internet-based system to a cable system, and certain legislative history purportedly indicating "that Section 111 be interpreted broadly." Dkt. 59, at 17. Each of these sources is addressed, in turn.

10

## I.    The Statutory Language

Section 111's definition of a "cable system" requires a "facility" that does two things:  (1) "receives signals transmitted or programs broadcast," and (2) "makes secondary transmission of such signals or programs by wires, cables, microwave, or other communications channels to subscribing members of the public."  17 U.S.C. § 111(f)(3).  It is undisputed that FilmOn's system received "programming made by network stations, such as WTTW in Chicago," thereby meeting the definition's first requirement.  *See* Dkt. 59, at 5; Dkt. 56, at 1.[4]  It is also undisputed that FilmOn's system "retransmitted this programming to individual users through secondary retransmissions over the Internet."  *See* Dkt. 59, at 5; Dkt. 56, at 1 ("FilmOnX captured the over-the-air broadcast signals of WTTW and retransmitted its copyrighted broadcast television programs to the public over the Internet.").  The parties dispute, however, whether such Internet retransmission meets the statute's requirement of transmission to the public by a "communications channel," and thus, whether FilmOn's facility makes the "secondary transmission" required by § 111.

---

[4] As noted above, FilmOn's mini-antenna system "was originally designed to comply with legal authority from the Second Circuit," *see* Alkiviades Decl., Dkt. 59-2, ¶ 21, which the Supreme Court has since overruled in *Aereo III*.  According to Mr. Alkiviades, "if this particular technical system is not required to obtain a Section 111 license, FilmOnX would likely use a master antenna in each facility to receive broadcast programming and to make secondary transmissions to users from the same copy of a particular broadcast program."  *Id*.  The Court understands, however, that such secondary transmissions would still be made over the Internet.  As such, and because this new system has not been implemented, the Court does not consider this contemplated change material to the issues addressed herein.

WTTW maintains that "the Internet is not a 'communications channel,'" pointing to case law instead describing the Internet as "an international network of interconnected computers,"[5] and an expert declaration opining that a communications channel "has specific, defining characteristics (i.e., bandwidth, noise and throughput) which the Internet does not have." Dkt. 75, at 8 (citing Jones Decl., Dkt. 51, ¶ 21).[6] FilmOn concedes that that "the Internet may be conceptualized as 'an international network of interconnected computers,'" Dkt. 80, at 7 (quoting *Reno*, 521 U.S. at 849), but dismisses WTTW's assertion that "the Internet is not a communications channel"

---

[5] *See* Dkt. 56, at 7; *see also Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 849 (1997) ("The Internet is an international network of interconnected computers."), *aff'g ACLU v. Reno*, 929 F. Supp. 824, 830-32 (E.D. Pa. 1996) ("The Internet is not a physical or tangible entity, but rather a giant network which interconnects innumerable smaller groups of linked computer networks. It is thus a network of networks. . . . There is no centralized storage location, control point, or communications channel for the Internet"); *ivi II*, 691 F.3d at 280 (the Internet "is neither a physical nor a tangible entity; rather it is 'a global network of millions of interconnected computers'" (quoting *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 403 (2d Cir. 2005)).

[6] Although FilmOn has moved to strike portions of the declarations of WTTW's expert (Nigel Jones), one of its attorneys (Julie Shepard), and its CEO/CFO (Reese Marcusson), FilmOn has not challenged the above-referenced paragraphs of Jones' Declaration opining that "[t]he Internet is not a communications channel." *See* Dkt. 82; Dkt. 51, ¶¶ 20-21. Rather, FilmOn challenges various paragraphs that pertain to other aspects of FilmOn's system (such as whether and when subscription or payment is required, geographic distribution, and alleged alterations to broadcast content) that do not bear on the issues addressed herein. FilmOn argues that these statements contain improper opinions or legal conclusions, lack proper foundation, and/or are unduly prejudicial. *See* Dkt. 82. To the extent the Court considers any of these declarations, it will necessarily disregard any portions that are inadmissible for any reason. For this reason, and because the challenged portions of these declarations are not material to the current motions for summary judgment, FilmOn's Motion to Strike (Dkt. 82) is denied as moot.

as "immaterial" and a mere "red herring." *Id*.; Dkt. 81, ¶ 33. According to FilmOn, whether the Internet is itself a "communications channel" is of no moment, because "[w]hen data is transmitted over the Internet, that data travels over one or more communications channels to reach its ultimate destination." Dkt. 80, at 8. But that evades the issue. Section 111's definition of a "cable system" is not satisfied simply by data traveling over *any* communications channel at *any* point before "its ultimate destination"; it requires the same "facility" that "receives" the signals or programs to make "secondary transmission of such signals or programs by wires, cables, microwave, or other communications channels *to subscribing members of the public*." 17 U.S.C. § 111(f)(3) (emphasis added). Since it is undisputed that FilmOn's retransmissions "to individual users" are made "over the Internet," Dkt. 59, at 5, the question of whether the Internet constitutes a "communications channel" within the meaning of § 111 is thus central to the issue of whether FilmOn's "facility" makes the "secondary transmissions" required by § 111.

Two district courts (the District of Columbia and the Central District of California) recently considered this question and came to different conclusions. In *Fox Television v. FilmOn X*, the District of Columbia held that FilmOnX's Internet-based retransmission services "are not cable systems entitled to a § 111(c) compulsory license." 2015 WL 7761052, at *21. The court observed that such services "receive the broadcast signals and retransmit them to Internet service providers, as opposed to sending them directly to the subscribers' digital device." *Id*. at 13. "It follows," the

court reasoned, "that the subscriber's device receives the retransmission, not from the 'facility,' but from interconnected computers through cyberspace." *Id*. And "[s]ince § 111(f)(3 requires that a physical 'facility' must receive the broadcast signals *and* make the secondary transmissions to paying subscribers, any system that fails to encompass the distribution medium and does not retransmit the signals directly to the subscriber does not qualify as a 'cable system.'" *Id*.

In so holding, the District of Columbia expressly disagreed with the Central District of California's decision in *Fox Television v. AereoKiller*. There, the court held that FilmOn is "potentially entitled to a § 111 license," but noted that "the legal issues are close," authorized "an immediate appeal to the 9th Circuit pursuant to Fed. R. Civ. P. 54(b)," maintained "the existing preliminary injunction pending the outcome of the appeal," and stayed the district court case during the interim, as well. *See AereoKiller*, 115 F. Supp. 3d at 1171. In addition to its characterization of the issue as close, moreover, the California court's analysis reveals more weakness in FilmOn's position than strength.

For instance, the court's opinion in *AereoKiller* acknowledges that the Internet "can't be a 'facility' for purposes of the § 111 analysis," *id*. at 1167; rather the "facility" comprises FilmOn's antennas which "receive Plaintiffs' public broadcast signal" in the first instance. *Id*. Those signals "are then retransmitted out of those facilities on 'wires, cables, microwave, or other communications channels.'" *Id*. But the California court stopped short of finding that such retransmissions are "to

14

subscribing members of the public," as § 111 requires. On the contrary, it found that "the 'facility that Defendants have control over and operate consists of the 'complicated electrical instrumentalities' used for retransmission, which **precede** 'the internet' in Defendants' retransmission scheme." *Id*. at 1167-68 (emphasis added). If anything, this analysis suggests a negative answer to the very question *AereoKiller* deemed dispositive: "whether **Defendants operate equipment** that . . . reformats those signals and then sends them out to the viewing public." *See AereoKiller*, 115 F. Supp. 3d at 1167 (emphasis in original). As the court put it, "without Defendants' facilities, the internet does not receive Plaintiffs' public broadcast signal." *Id*. This finding acknowledges (just as the District of Columbia found) that the Internet receives FilmOn's secondary transmissions, "as opposed to sending them directly to the subscribers' digital device." *See Fox Television*, 2015 WL 7761052, at *13 (such services "receive the broadcast signals and retransmit them to Internet service providers, as opposed to sending them directly to the subscribers' digital device").

Contrary to FilmOn's repeated insistence, this conclusion is unaltered by the further fact that its subscribers ultimately receive such content "via coaxial cables, fiber-optic cables, microwave links or any of the other communications channels that make up the physical layer of the Internet." *See* Dkt. 59, at 7, 15; Dkt. 59-7, ¶ 18; Dkt. 58, ¶¶ 33, 35; Dkt. 80, at 8; Dkt. 81, at 19-20, 23. As even FilmOn acknowledges, "the Internet may be conceptualized as 'an international network of interconnected computers.'" Dkt. 80, at 7. And while that international network may

deliver content through a "physical layer" (or "other types of distribution media"), it is nevertheless "a global network of interconnected computers over which [FilmOn] has no control," *Fox Television*, 2015 7761052, at *14, not the "facility" that "Defendants have control over and operate." *See AereoKiller*, 115 F. Supp. 3d at 1167 (Defendants' retransmission instrumentalities "precede 'the internet'").

Thus, while *Fox Television* and *AereoKiller* reached opposite results, both decisions nevertheless reveal the weakness in FilmOn's § 111 compulsory license defense—that the "'facility" Defendants "have control over and operate" makes secondary transmissions to the Internet (or internet service providers) "as opposed to sending them directly to the subscribers' digital device." *See AereoKiller*, 115 F. Supp. 3d at 1167; *Fox Television*, 2015 WL 7761052, at *13. Correspondingly, "the subscriber's device receives the retransmission, not from the 'facility,' but from interconnected computers through cyberspace." *Fox Television*, 2015 WL 7761052, at *13. This Court concurs with the District of Columbia in concluding that such an internet-based system "that fails to encompass the distribution medium and does not retransmit the signals directly to the subscriber does not qualify as a 'cable system'" under § 111(f)(3), and, thus, "is not entitled to a § 111(c) compulsory license." *Id.* This makes sense, moreover, since Congress enacted those provisions to cover the operation of cable television systems (not internet-based systems), which both receive signals and retransmit them directly to their customers.[7]

---

[7] The House of Representatives Committee on the Judiciary described a

FilmOn nevertheless resists this logic by arguing that § 111's "open-ended definition of a 'cable system' to include 'other communications channels' demonstrates a clear intent that the Act be construed to accommodate evolving technologies." Dkt. 59, at 14. But that argument suggests, not that FilmOn's internet-based system meets § 111's definition of "cable system," but rather, that the definition is ambiguous. As the District of Columbia explained: "The best Defendants could assert is that § 111(f)(3) is ambiguous, particularly with respect to (1) whether the entity must own or control its transmission path . . . and (2) whether the entity must retransmit broadcast signals exclusively by wires, cables, microwaves, or other communications channels." *Fox Television*, 2015 WL 7761052, at *16. In that event, well-established principles of statutory construction would require the Court to consider other sources to guide its interpretation, including the statute's legislative history, the case law that led to its enactment, and the case law construing and applying it since. *See In re B.R. Brookfield Commons No. 1 LLC*, 735 F.3d 596, 599-600 (7th Cir. 2013). In addition, as even FilmOn acknowledges, "the court may consider the agency interpretations of the statute." Dkt. 59, at 20.

---

"typical" cable system, and the compulsory license that would be available to such systems, as follows: "Cable television systems . . . pick up broadcasts of programs originated by others and retransmit them to paying subscribers. *A typical system consists of a central antenna which receives and amplifies television signals and a network of cables through which the signals are transmitted to the receiving sets of individual subscribers*. . . . the Committee has determined . . . to establish a compulsory copyright license for the retransmission of those over-the-air broadcast signals that a cable system is authorized to carry pursuant to the rules and regulations of the FCC." H.R. Rep. No. 94-1476, at 88-89 (1976) (emphasis added).

17

On the other hand, "[i]f the language of the statute is plain, our only function is to enforce the statute according to its terms." *Brookfield*, 735 F.3d at 599. As discussed above, in this Court's view, the definition of "cable system" in § 111(f)(3) is plain, and it plainly does not cover FilmOn's system. Nevertheless, because "the parties cite opposing cases that differ in their interpretation," the "rule against multiple interpretations of the same statute" requires consideration of the foregoing aids to statutory construction, even if the conflict in case law is due to an "outlier opinion." *See id.* at 599-600 (considering legislative history and "persuasive cases" to construe "plain" statutory language, where conflict was created by "outlier opinion"). Accordingly, the Court now considers the various legislative, agency, and judicial statements that bear on the definition of a "cable system" in § 111(f)(3), beginning with the Supreme Court's statements about "cable systems" in *Aereo III*.

## II.     *Aereo III's* References to a "Cable System"

According to FilmOn, the Supreme Court's conclusion in *Aereo III* that the accused internet retransmission service "publicly performs within the meaning of the [Copyright Act's] Transmit Clause" indicates that such internet-based systems "were meant to be reached by the entire Act," including its compulsory license for "cable systems." Dkt. 80, at 4; Dkt. 59, at 15. Thus, because the Supreme Court "based its decision" on a conclusion that the accused internet system was "substantially similar" to "a traditional cable system," FilmOn reasons that both should enjoy the same license. Dkt. 59, at 15. This Court disagrees, and it is not the first do so.

The first court to consider the impact of *Aereo III* on this question was the Southern District of New York, in a contempt proceeding against FilmOn enforcing the injunction to which it had stipulated years earlier. *See supra* note 2. That court followed the Second Circuit's decision in *ivi II*, holding that "the Copyright Act's 'legislative history, development, and purpose indicate that Congress did not intend for § 111 licenses to extend to Internet retransmissions.'" *CBS Broad. Inc.*, 2014 WL 3702568, at *4, *aff'd* -- F.3d --, 2016 WL 611903 (2d Cir. Feb. 16, 2016). The Southern District of New York reached the same result again in "*Aereo IV*" (on remand from *Aereo III*), similarly following *ivi II*. *See Am. Broad. Cos. v. Aereo, Inc.*, No. 12-1540, 2014 WL 5393867, at *4-5 (S.D.N.Y. Oct. 23, 2014). But while both decisions adhered to *ivi II* as "binding Second Circuit precedent," *id.*, they independently rejected FilmOn's argument here—that the Supreme Court's decision in *Aereo III* "implicitly overruled" *ivi II* or otherwise suggested a different result:

> Aereo's argument suffers from the fallacy that simply because an entity performs copyrighted works in a way similar to cable systems it must then be deemed a cable system for all other purposes of the Copyright Act. The Supreme Court's opinion in *Aereo III* avoided any such holding.
>
> Indeed, the Supreme Court consistently stated throughout its opinion that Aereo's similarity to CATV systems informed its conclusion that Aereo performs, not that Aereo is a cable system. . . . [T]he Supreme Court in *Aereo III* did not imply, much less hold, that simply because an entity performs publicly in much the same way as a CATV system, it is necessarily a cable system entitled to a § 111 compulsory license. . . . Stated simply, while all cable systems may perform publicly, not all entities that perform publicly are necessarily cable systems, and nothing in the Supreme Court's opinion indicates otherwise.

19

*Am. Broad. Cos.*, 2014 WL 5393867, at *3-5 (citations omitted); *CBS Broad.*, 2014 WL 3702568, at *4 ("A series of statements that Aereo (and, by extension FilmOn . . .) is very similar to a cable system is not the same as a judicial finding that Aereo and its technological peers are, in fact, cable companies entitled to retransmission licenses under § 111 of the Copyright Act.").

FilmOn dismisses both of these decisions as mere progeny of *ivi II's* "overly narrow reading of the Copyright Act.'" Dkt. 80, at 3 n.4 (quoting *AereoKiller*, 115 F. Supp. 3d at 1166). Noting that "this Court is not bound by the Second Circuit's decision" in *ivi II*, FilmOn urges the Court to follow instead the Central District of California's decision in *AereoKiller* rejecting *ivi II*'s approach. *Id.* But even the California court acknowledged that the Supreme Court's decision in *Aereo III* "was not answering the question at issue in this case," and thus "*Aereo III* does not control the result here." *AereoKiller*, 115 F. Supp. 3d at 1163. Moreover, the District of Columbia (which also was not bound by *ivi II*) similarly concluded that "the Supreme Court analyzed Aereo's activities only for purposes of the Transmit Clause," and thus, "any analogy to cable companies should be interpreted in that particular context." *Fox Television*, 2015 WL 7761052, at *10. This Court agrees (again) with the District of Columbia and the Southern District of New York: "The fact that 'an entity performs copyrighted works in a way similar to cable systems' cannot be construed as an order that such entity 'must then be deemed a cable system for all purposes of the Copyright Act.'" *Id.* (quoting *Aereo VI*, 2014 WL 5393867, at *3).

The Court likewise rejects FilmOn's reliance upon colloquy during the oral argument before the Supreme Court in *Aereo III*, in which Justice Sotomayor observed: "We say they're a cable company, they get the compulsory license." *See* Docket 59, at 16 (quoting Dkt. 61-1, at 98-99). According to FilmOn, this "reflects the Court's inclination to find companies like Aereo are entitled to a Section 111 license." *Id*. But a fair reading of the transcript shows that Justice Sotomayor inquired, "why aren't they a cable company?" and "Do we have to go to all of those other questions if we find that they're a cable company?" Dkt. 61-1, at 98-99. Given that the Court did address "those other questions" in its issued opinion, one might just as easily conclude that it found a § 111 compulsory license defense was unavailable.[8] But the point is moot, in any event. As the Southern District of New York, the District of Columbia, and the Central District of California all acknowledged, "the Justices' questions and commentary at oral argument have no legal effect." *Fox Television*, 2015 WL 7761052, at *11 (quoting *Aereo IV*, 2014 WL 5393867, at *4); *AereoKiller*, 115 F. Supp. 3d at 1163 n.13 ("colloquy at argument is not part of the decision of the Court."). "Had the Supreme Court wanted any of the cited statements to have controlling effect, it would have included them in the decision." *AereoKiller*, 115 F. Supp. 3d at 1163 n.13.

---

[8] *See Fox Television*, 2015 WL 7761052, at *11 ("the Justices' comments undermine Defendants' position because they show that the Justices were fully aware of a potential § 111 defense and yet chose not to mention it in the Court's opinion."); *Aereo IV*, 2014 WL 5393867, at *4 ("This awareness at oral argument coupled with silence in the opinion could just as easily imply that the Court did not conclude that the defense was applicable on the facts here.").

### III. The Statutory Scheme

Both sides claim to find further support for their respective constructions of a "cable system" by considering the Copyright Act "as a whole." Dkt. 59, at 13 (court must consider "the broader context of the statute as a whole"); Dkt. 56, at 6 (statute must be read in context of "the overall statutory scheme"). For its part, FilmOn points to the Act's definition of "'transmit' a performance" as "to communicate it by any device or process," arguing that this "technology agnostic 'any device or process' language is not limited to the Transmit Clause, but applies to the Copyright Act as a whole including the compulsory licensing scheme." Dkt. 59, at 14 n.5 (quoting 17 U.S.C. § 101). According to FilmOn, "it would make little sense" to read the Transmit Clause as "applying to any technology that communicates a performance by means of any device or process – but then to adopt a different construction of 'secondary transmissions,' 'transmitted' and 'retransmitted' for the purposes of the Section 111 license." Dkt. 80, at 6-7. There are two problems with this argument.

For one, FilmOn's construction of a "cable system" falters not with its interpretation of "transmit," but rather in its insistence that a "cable system" requires merely a facility "that receives and retransmits broadcast programming." Dkt. 80, at 9. As explained above, this definition impermissibly fails to account for § 111's further requirement that the facility make such secondary transmissions by a communications channel "to subscribing members of the public." *See* 17 U.S.C. § 111(f)(3); *Fox Television*, 2015 WL 7761052, at *13 (noting that "§ 111)f)(3)

22

requires that a physical 'facility' must receive the broadcast signals *and* make the secondary transmission to paying subscribers").  Indeed, § 111(f)(3) reinforces this requirement with reference to a cable system's "headend," which is commonly understood to perform that very function.[9]  While this reference to a "headend" in § 111 is for "purposes of determining the royalty fee" that a "cable system" must pay, it nevertheless provides context for the definition of a "cable system" in the preceding sentence which requires precisely what a headend does—make secondary transmissions "to subscribing members of the public."  *See* 17 U.S.C. § 111(f)(3).

The second problem with FilmOn's "technology agnostic" approach to "the Copyright Act as a whole" is its failure to recognize the clear difference in language between the Transmit Clause in § 101 and the definition of a "cable system" in § 111. Whereas the Transmit Clause embraces any communication "by any device or process whereby images or sounds are received beyond the place from which they are sent," § 111's definition of a "cable system" requires specific communications ("secondary transmissions") to specific recipients ("subscribing members of the public") by specific means ("by wires, cables, microwave, or other communications channels").

---

[9] *See* 17 U.S.C. § 111(f)(3) (referring to "two or more cable systems . . . operating from one headend"); *ivi II*, 691 F.3d at 280 n.5 ("A cable system's 'headend' is its control center, from which a cable company receives signals and then transmits them, by coaxial cable, to the company's subscribers." (quoting *Satellite Broad & Communications Ass'n of Am. v. Oman*, 17 F.3d 344, 346-47 n.5 (11th Cir. 1994)); *Fox Television*, 2015 WL 7761052, at *13 ("Unlike FilmOnX, cable companies have a control center known as 'headend,' from which they both receive the signals and directly retransmit them by coaxial cable, wires, or microwave links to their subscribers.").

*Compare* 17 U.S.C. § 101 *with* § 111(f)(3). Thus, although § 101's broad definition of "transmit" plainly applies to the activities of internet-based retransmission services such as FilmOn's "whereby images or sounds are received beyond the place from which they are sent" (as the Supreme Court held in *Aereo III*), not so for § 111's narrower definition of a "cable system," which requires "secondary transmissions" by "communications channels" to "subscribing members of the public." *See Fox Television*, 2015 WL 7761052, at *11 ("Unlike the definition of a cable system in § 111(f)(3), the text of the Transmit Clause supports such a broad reading.").

## IV. The Legislative History

As noted above, FilmOn's "technology agnostic" approach to § 111(f)'s definition of a "cable system" is similarly at odds with the legislative history. *See supra* note 7. Contrary to FilmOn's insistence that this term should be read broadly to cover "any device or process" consistent with § 101's definition of "transmit," the Judiciary Committee's Report on the 1976 amendments to the Copyright Act draws a marked distinction between the definitions in § 111(f) and those in § 101: "These definitions are found in subsection (f) rather than in section 101 because of their particular application to secondary transmissions by cable systems." H.R. Rep. 94-1476, at 98. Thus, while the definitions in § 111(f) have "particular application" to cable systems, the definitions of "perform," "display," "publicly," and "transmit" in section 101 cover "any further act by which [a] rendition or showing is transmitted or communicated to the public." *Id*. at 63. In particular, the Report highlights § 101's "broad" definition of "transmit":

The definition of 'transmit' -- to communicate a performance or display 'by any device or process whereby images or sound are received beyond the place from which they are sent' **-- is broad enough to include all conceivable forms and combinations of wires and wireless communications media, including but by no means limited to radio and television broadcasting as we know them.** Each and every method by which the images or sounds comprising a performance or display are picked up and conveyed is a 'transmission,' and if the transmission reaches the public in [an]y form, the case comes with the scope of clauses (4) or (5) of section 106.

*Id*. at 64 (emphasis added).

Sharply contrasting this sweeping description of "transmit" as used in § 101 (as embracing "all conceivable forms and combinations of wires and wireless communications media"), this same Report described the "cable system" of § 111 in narrower terms: "Cable television systems are commercial subscription services that pick up broadcasts of programs originated by others and retransmit them to paying subscribers. A typical system consists of a central antenna which receives and amplifies television signals and a network of cables through which the signals are transmitted to the receiving sets of individual subscribers." *Id*. at 88-89. This description jibes with § 111(f)'s definition of a "cable system," which similarly requires secondary transmissions by "communications channels" to "subscribing members of the public." 17 U.S.C. § 111(f)(3). Equally important, and consistent with this clear difference in scope, the Report also explains that the "approach" of the Act "is to set forth the copyright owner's exclusive rights in broad terms in section 106, and then to provide various limitations, qualifications, or exemptions in the 12 sections that follow." H.R. Rep. 94-1476, at 61. The compulsory license afforded to

a "cable system" under § 111 is one such "limitation" on a copyright owner's "broad" exclusive rights. FilmOn's contention that this "limitation" should be construed as broadly as the "broad" rights it limits is thus plainly contrary to the legislative record.

FilmOn disregards this history and points instead to an earlier Congressional hearing statement noting that § 111 "deals with all kinds of secondary transmissions" "usually cable but sometimes other communication channels, like microwave and apparently laser beam transmissions that are on the drawing board if not in actual operation." Dkt. 59, at 17 (quoting Hearings on H.R. 2223 (1975), at 1820). But while this statement confirms that a cable system may use a wide array of "communications channels," it in no way undermines § 111's requirement of secondary transmissions to "subscribing members of the public" (as opposed to the "global network of interconnected computers" that comprise the Internet, over which FilmOn "has no control"). *See Fox Television*, 2015 WL 7761052, at * 14. Nor can one garner such intent from Congress' 1994 amendment of § 111 to add "microwave" as "an enumerated communication channel." *See* Dkt. 80, at 15. According to FilmOn, this "legislative fix suggests that Congress intended the term 'other communications channels' to be interpreted broadly to include new technologies." *Id*. But in this Court's view, this amendment instead indicates that Congress has amended § 111 when necessary to correct "an unnecessarily restrictive interpretation." *See id*. (quoting H.R. Rep. 103-703, at 17 (1994)). Yet Congress has not sought to override the view now long-held by the Copyright Office, and the many courts following it, that internet retransmission services are ineligible for a § 111 license.

26

## V.     The Copyright Office Construction

"For over fifteen years, the Copyright Office has taken the position that Internet-based retransmission services are not cable systems and do not fall within § 111." *Fox Television*, 2015 WL 7761052, at *17.  Indeed, by 1997, the Copyright Office had "studied this issue exhaustively" and determined that "Internet and similar digital online communications services are not, and never have been, eligible to claim the cable or satellite compulsory licenses created by Sections 111 or 119 of the Copyright Act."  *See* Dkt. 54-6, 145 Cong. Rec. 30980 (daily ed. Nov. 19, 1999) (statement of Sen. Orrin Hatch).  The then-Register of Copyrights, Marybeth Peters, confirmed that position in a letter to the Senate Judiciary Committee, dated November 10, 1999.[10]  Ms. Peters then reaffirmed this position in statements before a House Subcommittee in June 2000;[11] the Copyright Office again reconfirmed this position in its Satellite Home Viewer Extension and Reauthorization Act Section 109 Report ("SHVERA Report") of 2008;[12] and again when FilmOn itself sought a § 111 license. *See* Dkt. 54-1 ("such a service falls outside the scope of the Section 111 license").

---

[10]   *See id*., Dkt. 54-6 ("It is my understanding that some services that wish to retransmit television programming over the Internet have asserted that they are entitled to do so pursuant to the compulsory license of section 111 of Title 17.  I find this assertion to be without merit.").

[11]   *See* Dkt. 54-2, at 3 ("the cable compulsory license could not reasonably be interpreted to include Internet retransmissions. . . . if there is to be a compulsory license covering such retransmissions, it will have to come from newly enacted legislation and not existing law.").

[12]   *See* Dkt. 54-4, at 188-89 ("The Office continues to oppose any Internet statutory license that would permit any website on the Internet to retransmit television

Even FilmOn acknowledges that the Court "may consider" the Copyright Office's long-held view that § 111's compulsory license does not apply to Internet retransmission services, as an aid in the Court's construction of that statute. *See* Dkt. 59, at 20 ("court may consider the agency interpretations of the statute" if it determines the statute is ambiguous). The only dispute goes to the degree of deference due those views. WTTW argues that "*Chevron* deference should be afforded to the Office's interpretation," Dkt. 56, at 15, meaning that the Court "must defer to the agency's interpretation if it is reasonable." *Ind. v. E.P.A.*, 796 F.3d 803, 811 (7th Cir. 2015). FilmOn counters that "opinions expressed by the Copyright Office in policy documents"—as opposed to a "rule or regulation after a formal notice-and-comment period"—"are not entitled to *Chevron* deference." Dkt. 59, at 20-21. Instead, FilmOn argues, "interpretations contained in formats such as opinion letters" are "entitled to respect" under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), "but only to the extent that those interpretations have the power to persuade." *Id*. (quoting *Christensen v. Harris Cnty*, 529 U.S. 576, 587 (2000)).

The Court agrees with WTTW that "the Copyright Office has developed and set forth its interpretation regarding Internet retransmission services in a much more involved and formal process than in opinion letters and internal agency manuals which have been excluded from Chevron deference (but which remain eligible for

---

programming without the consent of the copyright owner. . . . The Office also recognizes that any possible expansion of the statutory licenses to the Internet will likely implicate international obligations. . . . this is a reason in itself not to recommend expanding the licenses to cover Internet retransmission.").

28

Skidmore deference)." Dkt. 75, at 13. As WTTW notes, "Congress repeatedly has requested the Office to submit reports and to testify concerning the implementation of Section 111."[13] The Office has also engaged in notice-and-comment proceedings concerning the scope of § 111, although those proceedings and ensuing regulations addressed satellite carriers, multipoint distribution services, and multichannel multipoint distribution services, and "did not specifically address the question of whether an Internet-based retransmission service qualifies as a cable system." *See Fox Television*, 2015 WL 7761052, at *17 n.19 (citing 57 Fed. Reg. 3284, 3290).

Given this long history, the Court is by no means dismissive of the Copyright Office's considered opinions on these issues. And the Court is mindful that an absence of formal "notice and comment" rulemaking "does not automatically deprive" an agency's interpretation "of the judicial deference otherwise its due," particularly when that interpretation "is one of long standing," as is the case here. *See Barnhart v. Walton*, 535 U.S. 212, 221-22 (2002). Still, given the absence of formal rulemaking on the particular issue posed here, and because the Office has issued formal rulemaking in the satellite context, the Court "will assume for the sake of argument" that the foregoing pronouncements by the Copyright Office garner only *Skidmore* deference, and consider them solely for their persuasive power. *See Wisc. v. Ho-*

---

[13] *See* Dkt. 56, at 16-17 (citing Dkt. 54-3, Satellite Television Extension and Localism Act, § 302 Report (2011); Dkt. 54-4, Satellite Home Viewer Extension and Reauthorization Act Section 109 Report (2008); Dkt. 54-2, Statement of Marybeth Peters, Register of Copyrights Before the House Subcommittee on Courts and Intellectual Property, 106th Congress, 2d Sess. (2000); Dkt. 54-5, A Review of the Copyright Licensing Regimes Covering Retransmission of Broadcast Signals (1997)).

*Chunk Nation*, 784 F.3d 1076, 1086 (7th Cir. 2015) (assuming commission letter was "too informal to trigger *Chevron* deference"); *Fox Television*, 2015 WL 7761052, at *17-18 and n.19 (*Chevron* deference inapplicable to Copyright Office statements and reports regarding eligibility of internet retransmission services for § 111 license). Contrary to FilmOn's contentions, however, the Court finds the Copyright Office's conclusion that internet retransmission services are not "cable systems" within § 111 to be thorough, reasoned, and consistent, and thus persuasive, at a minimum.

In addition to the legislative history and statutory text (which it concluded "could not reasonably be interpreted to include Internet retransmissions"), the Copyright Office has carefully considered the significant differences between Internet retransmitters such as FilmOn and the "heavily regulated" retransmission services eligible for compulsory licensing to which § 111 was uniquely "tailored." *See* Dkt. 54-2, at 3. Such differences, the Office has explained, include (among other concerns) Congress' view "that the Internet should be largely free of regulation" (whereas a compulsory license "depends so heavily on such restrictions"), and "the Internet's ability to disseminate programming 'instantaneously worldwide'" (increasing piracy risks and giving rise to treaty and other international implications). *Id*. at 2-3; Dkt. 54-4, at 188-89; Dkt. 54-5, at 95-97; Dkt. 54-6 at S14990. The Copyright Office cited the same concern—that "Section 111 is meant to encompass 'localized retransmission services'"—when it declined to process FilmOn's application for a compulsory license under that Section. *See* Dkt. 54-1.

Tacitly conceding the accuracy of these observations, FilmOn now seeks to neutralize them by promising "a more refined geolocation-based system that reliably limits retransmissions of broadcast programming" to a given designated market area ("DMA"), as well as new security measures. Dkt. 59, at 24-25; Dkt. 59-2, ¶ 18. According to its CEO, "FilmOn X has developed a sophisticated geolocation system to restrict the delivery of OTA content to viewing devices located within the DMA of the primary transmission," and "also has developed an end-to-end encryption system using HTTPS to protect the transmission stream from piracy." Dkt. 59-2, ¶ 18. But these offers do nothing to narrow the chasm between internet retransmission services and the cable systems of § 111. As the Southern District of New York concluded in *Aereo IV*, the fact that an Internet retransmitter "may voluntarily limit its services to certain geographic areas does not change the fact that Internet retransmissions are still *capable* of reaching much farther afield than the localized cable systems that Congress intended § 111 to cover." *Aereo IV*, 2014 WL 5393867, at *5.

Accordingly, this Court finds highly persuasive the Copyright Office's conclusion that an internet-based retransmission service such as FilmOn's "falls outside the scope of the Section 111 license." *See* Dkt. 54-1. This agency determination, combined with the above-discussed statutory language, legislative history, and case law reaching the same conclusion, compel the Court to reject FilmOn's § 111 claim and affirmative defense in this case.[14]

---

[14] Given the Court's ruling that FilmOn's internet retransmission service is not a

## CONCLUSION

For the foregoing reasons, Defendant and Counterclaim Plaintiff Window to the World Communications, Inc.'s Motion for Partial Summary Judgment (Dkt. 48) is granted; Plaintiff and Counterclaim Defendants' Motion for Summary Adjudication of First Cause of Action for Declaratory Relief and Section 111 Affirmative Defense (Dkt. 57) is denied; and Plaintiff and Counterclaim Defendants' Motion to Strike Portions of the Declarations of Nigel Jones, Julie Shepard and Reese Marcusson (Dkt. 82) is denied as moot.


Dated:  March 23, 2016          Charles P. Kocoras
                                United States District Judge

---

"cable system" within the meaning of § 111(f)(3), it is unnecessary to resolve WTTW's contentions that FilmOn fails to qualify for a § 111 compulsory license for other reasons, such as whether FilmOn limited its service to "paying subscribers." *See* Dkt. 56, at 24-25.  Likewise, because the parties' respective motions sought summary judgment solely as to FilmOn's declaratory judgment claim and § 111 affirmative defense, *see* Dkts. 48 and 57, the Court also does not reach WTTW's arguments concerning FilmOn's alleged past infringement.  *See* Dkt. 56, at 25.